for U.S. Magnesium v. United States. Mr. Tellep? Yes, Your Honor. Before we start the clock running, though, I guess we kind of had an inquiry for both sides with regard to the extensive confidentiality markings in the briefs in this case. And as some of you here may know, we've recently changed and dramatically decreased the pathway towards confidentiality markings, but these briefs weren't subject to our new rules. And I guess I can turn to my colleagues if they have any comments, but we really thought it was not apparent to us that certain of the confidentiality markings, which seemed kind of central to the way things we would want to talk about in this case, were marked confidential. So I don't know if my colleagues have any comments. One thing that immediately comes to mind and seemed to be of fairly significant importance to the case is the whole question of the life expectancy for the retorts. And that was marked confidential, which we found puzzling and also extremely inconvenient. It would be difficult, I think, to write an opinion that would make sense without talking about a factor such as that. I'd like to hear from counsel on that point. As well as the broader point of whether if you're prepared to waive confidentiality as to everything in the briefs, that would be splendid, but I don't expect that that's what we're going to hear. Your Honor, it's Dave Riggle on behalf of Tingen Magnesium International, defendant intervener here. We have agreed with counsel to waive confidentiality with regard to the cost of production sub-ledger and the amount of time that these are usable, the usage time. That waiver covers all parties here? Yes. Okay. It can be discussed in open court. It was going to be inconvenient to try to do the argument without having that waiver today. So in agreement with the Department of Justice, we waived it. And the other side understands that as well? They have been informed. Do you have a comment? I do. Your Honor, we were apprised of counsel's desire to waive confidential treatment over these two documents, the COP sub-ledger and the other document on Friday. We indicated our opposition. We did not know that counsel had contacted the court. We're aware that this conversation or communication has taken place between counsel for TMI and the court. And we indicated our opposition on Friday afternoon. It was one day before the argument. We prepared for an argument that was going to preserve the existing confidentiality designations that have been in the case since the administrative proceeding in the Court of International Trade. The communication with the court? What was the communication with the court? I understood, Your Honor, to indicate that there had been some... Perhaps I'm wrong about that. I understood, Your Honor. This is the first communication this member of the court has had with the other side occurred 30 seconds ago. Understood, Your Honor. Then I misunderstood your point. I don't know if it may have been contact with the clerk's office or something like that, but this is all new to us. It was new to me as of Friday as well, Your Honor. Well, you had a lead on us. But this isn't your confidential information to... No, it is not. It is TMI's confidential information. So why do you have... You don't have a dog in that fight, do you? Well, we do because to waive the waiver is a selective waiver. The two documents that TMI and the government want to discuss are important to their case. They're important to ours as well. But it's not a complete waiver of confidential information. And if it had been, then there are all sorts of documents that we would like to discuss as well. But the offer to waive confidential information was applicable only with respect to two documents, not other documents found in the record. Well, just with respect to the extent to which you're willing to waive, I hope you would recognize that better late than never, as we say, but not much better, only because for our own purposes, I hope you can appreciate that we prepare for these cases and we take seriously the confidential markings. And therefore, when we're thinking about what we can ask and we're thinking about what we can write, we've wasted a lot of time doing that by a release on the morning of argument. And notwithstanding the extent to which our court feels very strongly that the public has a right to know about everything in the case and not to. So even though you're willing to talk about this stuff in open court, the public still does not have access to that information in the briefs. I apologize, Your Honor, for the delay in this. This is really fairly recent for us. And I had to get authorization from my client to go ahead and waive this. And it was done for purposes of clarity. All right. Well, why don't we proceed? All right. Now we're ready for argument to begin. Thank you, Your Honor. Just for the rules of the road, are we operating under the constraints where BPI, Business Proprietary Information, is preserved as confidential or not? I just need to know because I'd like to, if business is in court, then I would modify my comments. If not, then I will keep my comments as I've constructed them so far. Well, they've waived it with respect to those two matters. Do you understand that to be the extent of their waiver? That's fine, Your Honor. I mean, if you're asking is everything else waived, I didn't hear that. So I think not. All right. Very good. Thank you. Well, we have a further comment. I just want to clarify. The 60-day usage period is waived. Right. The information in the cost of production sub-ledger is waived. Everything else is not waived. Everything else, those are the only things that my client has specifically waived. That's why I'm instructed as of this morning. Good. Thank you. I do. Thank you, Your Honor. My name is Jeff Telep. I'm with the law firm of King and Spaulding, here representing U.S. Magnesium, the appellant in this proceeding. The issue in this case, Your Honor, is whether the Commerce Department's determination that retorts are an indirect material used in the production of magnesium using the pigeon process is based on substantial record evidence and is otherwise in accordance with law. It is not. Commerce's determination was a results-driven exercise. It was arbitrary. And shown by the volume of evidence, Commerce simply refused to consider, even though it detracted from the final determination, makes this a reversible decision. What do you mean? I'm sorry. Well, you say it refused to consider. Is that a little broad? I mean, they considered it. They just didn't give a lot of weight to it or as much weight as you'd like, right? They considered everything in the record. They didn't completely ignore everything. They just didn't give it the weight you thought it should be. They ignored very specific and concrete pieces of evidence, starting, Your Honor, with the HACC affidavit. U.S. Magnesium submitted the declaration of Mr. HACC. Mr. HACC was the managing member of MAGPRO, LLC. He spent seven years improving the thermal process for the affidavit, that to accurately account for the costs of producing magnesium using the pigeon process, retorts should be treated as a direct material input because they are central to the production process, have a short, useful life, are consumed by the process, and have a very high unit cost. Was there any dispute or disagreement with the substance of what he said, the cost, the relative cost, the lifespan, and so on? I think there was, Your Honor. There was no argument about consumption. However, whether it was central to the production process, the useful life, and the high unit cost were issues that were considered to some degree by the Commerce Department and held against U.S. magnesium. This document was central to our case. It was not considered by Commerce. It was not considered by Commerce in the final determination. It was not considered by Commerce in the remand determination. It was not considered by the Court of International Trade. It wasn't even acknowledged in the briefing before this Court by counsel for the government and by counsel for TMI. This is a compelling piece of evidence in our review. It was a sworn testimony taken under oath, and it was just simply ignored. It was ignored. It wasn't disregarded. It wasn't considered and disagreed with. It was simply ignored. You said in your opening that the decision was, I think you said, result-driven or result-oriented. Yes. What do you mean by that? Well, for example, the relative cost of the input is a good, is an item that Commerce oftentimes considers when it considers direct material inputs, whether a material input is a direct material or not. If you go to the final determination, what Commerce said is, well, relative cost is something that we normally consider. However, we normally consider it when we're talking about not factory equipment, but about other things, indirect materials, for example. In this case, this is factory equipment, so relative costs are not that important to our consideration. The costs are irrelevant here because we've already decided, in essence, it's a result-oriented decision that retorts or direct materials are equipment. Now, later on, Commerce decided that retorts were not equipment. I'm not sure I follow you and why this is result-driven or result-oriented. What do you mean by that? Do you mean that you think that they attached too much weight to the evidence that was on the other side, or what do you mean? No, I think that they, I don't know exactly. Do you think they had decided before they even looked at the evidence how they were coming out and then summoned whatever they had on the side that they wanted to reach? I think that they, for reasons that I'm not privy to, had more or less concluded that retorts were going to be overhead, either equipment or indirect materials, not direct materials. Then they started going through the evidence. Then when the evidence was not consistent with their understanding, they disregarded the evidence. Another example, traceability. We had lots of evidence in the record on traceability. We put in record evidence about the consumption rate of magnesium using TMI's own processes. We put in information about CMC and CBC, two other pigeon process manufacturers' consumption rates. We put in evidence showing that the material out specification sheet and the cost sheet, both of which were part of TMI's accounting records, showed that the exact amount of retort, the value of retorts coming out of warehouse in December 2009 was the amount of retorts being used in the production of magnesium during the same period, all of which goes to how one would trace costs through to the final magnesium product, one of the considerations that commerce has used. What did commerce say about it in the final determination? There is no record evidence of traceability. That was repeated by the Court of International Trade. No record evidence of traceability. It's right there in the record for all to see. The evidence showed, for instance, how many times the retort was used before it was exhausted and all of the details that you just told us about? Yes. We have evidence of consumption rates for retorts from three different sources. TMI's suppliers own books and records. We calculated a retort consumption rate, which is business proprietary information, but it's there in our briefs. We have evidence from CMC and we have evidence from CVC. CMC is Chinese Magnesium Corporation, a Chinese magnesium producer using the same pigeon process. CVM is a Malaysian manufacturer using the same pigeon process. Both of them have retort consumption rates that are consistent with TMI's, but this information was not considered by commerce. I thought commerce, with respect to the Malaysian producer, said this is a one-off, which we don't attach great significance to. Not on traceability. They did address the Malaysian numbers, did they not? That came up under the context of industry practice. One of the criteria that commerce considers when it decides whether or not a material is a direct material or not is how the industry treats the input. We put in evidence of five manufacturers. CVM, the magnesium manufacturer, is the one you just referred to. Commerce conceded that CVM treats retorts as direct materials. That's what they said about CVM. Did they address traceability in the context of CVM's evidence? No, they didn't. Speaking about industry practice, we also submitted evidence from CMC. Again, not mentioned in the final determination. CVCMC was also not mentioned in the remand determination. They, like CVM, had calculated a per unit cost of magnesium together with a consumption rate showing that CVCMC recorded its own retorts as direct materials in its books and records. Again, CMC not mentioned in the final, not mentioned in the remand determination. We submitted evidence from Southern Magnesium. They had several years of information. Three years, 93, 94, 94, 95, 95, 96, all had information in the record showing that retorts were considered to be direct materials. Commerce focused on a later year, the year before Southern Magnesium ceased producing magnesium to decide that there might be something in the record that indicates that retorts are not direct materials. If you look at the record, what they said was that Southern Magnesium stopped recording retorts as direct materials because it collapsed two of its accounting categories. All they had was raw materials and other direct materials, ferrosilicon and other direct materials. We took a look at that record and said, well, the numbers still add up. All the numbers that used to be in the column for retorts are still there in the column for other direct materials and concluded that retorts were still being classified by Southern Magnesium as a direct material. We calculated ratios out into the out years showing exactly the same thing. Commerce got a hold of that information and said, well, the numbers vary over time. If the numbers vary, that means retorts may or may not be in the category of direct materials anymore. That's not so. If you look at the financial statements, it's clear that the ratio of direct materials to total materials went up. If the ratio of direct materials to total materials went up, that means that retorts are still in the category of other direct materials. It's arithmetic. It's not a question of interpretation. It's a question of math. If that number went up, the ratio went up, that means that retorts are still part of direct materials. We submitted evidence about TMI's supplier's own experience. I'm bound to some degree here by the BPI designations, but it's evident if you look at our briefs that when you look at the cost sheet, the material out specification sheet, the COP sub ledger, and our reconciliation document, that you can trace indirect materials all the way through every single one of those statements, and retorts are not in that classification. TMI does not keep its retorts or record its retorts as indirect materials as claimed by the government. It's right there in the accounting documents. We've also submitted evidence again of Mr. Hack showing that retorts are kept pursuant to industry practice as a direct material and not as an indirect material, and certainly not as equipment and overhead. I also wanted to address two other issues. I think the number, correct me if I'm wrong, but my recollection is the number that you proposed that would be a reasonable number for the period of use of a piece of equipment before it needed to be replaced was about a year. Is that your break point for calling it indirect as opposed to direct? It gets consumed, but only after a year's use. I think it's important to get an understanding of why frequency of use is a relevant factor to consider. Basically, it's a question that comes up in the context of valuing equipment. In other words, is equipment replaced so frequently that we consider it to be a direct material or do we consider it to be equipment? Sure, but I'm looking to you for what you think is the minimum period of lifetime, life expectancy for a piece of equipment before you characterize it as a piece of equipment as opposed to, in effect, raw material. I can say what Commerce has considered. Plainly, a year would characterize a piece of equipment as equipment rather than a direct material. That largely has to do with amortization schedules and depreciation and all the rest. We cited three decisions in our brief, laminated woven sacks, diamond saw blades, and nails, certain nails, all of which talked about the production or the use of materials during the period of review or during the production run of the period of review. In those cases, the period of review was either six or 12 months, depending on the determination. When Commerce, in the past, pursuant to its precedent, has looked at what constitutes an appropriate period of review or length of time for frequency of replacement, it's said that products become or inputs become overhead in the six to 12-month range. That's consistent with accounting principles. It's consistent with the idea behind equipment being an appreciable asset. It's consistent with basically what they've done, again, in the last three determinations. In our situation, the frequency of replacement is 60 days, which is considerably less than the six-month period or the 12-month period that the Commerce Department has found in the past. The final point I would make on that is simply that Commerce has not articulated any basis or any standard other than 60 days is too long. 60 days is too long. There's not an articulable standard. They've cited the diamond saw blades, but there's nothing in the diamond saw blade standard that says whether 60 days is enough, too much, too long, too short. Commerce has to have a reasoned basis for making its decision. It can't just willy-nilly pick and choose the facts that it would like and say, well, that one's too short and that one's too long. It's got to have a reasoned basis for doing so, and it hasn't articulated one here. To the extent we've been able to point to Commerce precedent, the period of time is considerably longer than 60 days. Thank you. You're into your rebuttal. Thank you, Your Honor. Thank you. You're dividing argument, but you have the bulk of it, correct? Sorry, Your Honor? You're dividing up argument, but you have the bulk. Yes, I have 12 minutes and TMI has three minutes. May it please the Court, Eric Lofgren for the United States. This is a substantial evidence case. The bottom line is that U.S. Magnesium disagrees with a factual determination made by Commerce that retorts should be treated as an indirect input when identifying the factors of production. Is it really just substantial evidence? We were talking about the possible fundamental error of law in terms of what Commerce does or doesn't consider. You think that that's also substantial evidence? Well, what Commerce considers in this type of case is it's a case-by-case inquiry. So what Commerce can consider on a various review is broad. It can consider many factors, and it can identify the ones that it believes to be the most probative as to whether or not something is an indirect input or not an indirect input. And that's exactly what Commerce did in this case. It provided an extensive explanation for its decision in the Issues and Decision Memorandum, which is contained in the Joint Appendix. And it explained all the factors that it considered, the various arguments made by the parties, and then identified certain factors out of a larger package that it found to be particularly probative. In this case, Commerce looked at a number of things, but the two things they found to be most probative were, the first, the lack of physical incorporation. No part of the steel retort is contained in the finished magnesium product. And the second one is the life of the retort. And then here it was 60 days. And Commerce looked at its past practice and saw things that, all right, in the silico-manganese case, it wasn't incorporated, but the electrode paste was used every time the product had to be manufactured. And then there are some other cases, of course, that were indirect inputs have a longer lifespan. So Commerce had to consider, well, where does this fall in between? And it made a reasonable determination that it looked more like an indirect input than a raw material. Does Commerce have any precedence in its own decisions with a replacement period as short as 60 days, in which it said that this is nonetheless indirect? Well, there's no real hard and fast line that Commerce has drawn. But I'm asking, is there any that has a number that is in the 60-day region range? A lot of times we don't necessarily know because that information isn't necessarily public. Like in this case, we just waived the 60-day period. Right. So in diamond saw blades. That's the graphite and steel. That's the graphite and steel. But we don't know how much time the graphite or the steel lasted, right? No. And it doesn't necessarily, it's not necessarily, there's no rule. There's no Commerce regulation that wasn't followed in this case with respect to how long there must be for a useful life. And when we talk about consumption and traceability, again, there's no part of the retort that is in the final magnesium product. And that's a distinction with diamond saw blades, where you had the graphite molds in which the portions of the graphite were ultimately contained in the final product versus the steel molds where no portion of steel. Now, Mr. Tell referenced the HAC declaration. And also in their administrative case brief, what they say is the retort was consumed by the process. The value of the retort was consumed by the process. That's very different than having the retort itself be consumed in the final product. And that's an important point in this case, the lack of physical incorporation. It's an important point, but it wasn't decided, was it? It was absolutely. It was one of the two factors that Commerce found to be particularly probative. Or implicitly decided, you're saying. In the issues and decision memorandum, there's no dispute among any of the parties that the retort itself is not incorporated into the final product. I mean, that's in U.S. Magnesium's brief. All the parties agree. The retort, the stainless, not the stainless steel, the steel, too. You know, it doesn't degrade and then end up in the final product. I mean, they're producing pure magnesium. I gather that it was also not disputed that after two months of use, it was useless for that purpose, unless a certain amount of refurbishment or whatever else that isn't in the record took place. Is that correct? That's the information that TMI supplied for the record, that it's the producers, the manufacturer, I guess, calculates the useful life of about 60 days. How many cycles does that represent of the magnesium production? How many cycles per day would there be in which the retorts were used in the process? Or per week? I would have to ask my colleague if she can identify that. Well, maybe when she gets up, she can tell us. Or, no, my colleague from Commerce. Oh, I'm sorry. I guess it's – that's right, Mr. Riggle is going to argue for the TMI. Yes, you're right. All right, well, maybe Mr. Riggle can tell us. And also, we need to look at what the trial court determined in this case. And the trial court made an observation that the steps that Commerce took, the evidence it considered, and its past practice all lead the trial court to have concluded that Commerce's decision was based on substantial evidence and in accordance with the law. And, again, one other point I'd like to highlight is U.S. Magnesium did a really nice job of describing the development of the record in this case. Now, there was a very extensive factual record that was developed by the parties that Commerce relied on. There are multiple questionnaires that were provided to TMI seeking information. And so based on this very extensive record, Commerce has to be – is presumed to have considered all the information that's presented. And its own issues and decision memorandum contained in the joint appendix really does reflect how seriously Commerce took this issue. Now, U.S. Magnesium may not agree with the weight assigned to the various evidence that was placed on the record, but, again, that's a factual determination. This is a substantial evidence case. Commerce provided a rational explanation for the choice that it made and for the evidence that it found to be the most probative, and that's what led the trial court to sustain the remand results. If you take away the physical incorporation factor and you discount the 60 days, let's assume that we should conclude that the 60 days isn't really long enough to turn it into, in effect, a furnace or some other piece of permanent equipment for purposes of distinguishing between direct and indirect. What are the remaining facts that favor the result that Commerce reached? The remaining – there's the financial statements that were placed on the record weren't necessarily conclusive one way or the other. The description of the – I mean, there's really – the evidence that's on the record that supports that, the determination that they're an indirect input, other than the lack of physical incorporation and other than the days of the useful life, it would have to be – you have to look at the actual nature of the item itself. You know, what is it used for? In this case, if you look at the actual process, what it's used is to – is essentially a container where a chemical reaction takes place. It's not a raw material that's constantly being, you know, being input into the product in order to make pure magnesium. It's a vessel in which a chemical reaction can occur. Is there any documentary evidence that favors – actually, affirmatively favors the outcome that Commerce reached, as opposed to simply being, as you expressed it a moment ago, unclear? Well, I think the description of the process itself, the pigeon process, which is contained in the record, does support, you know, does support a conclusion that retort should be treated as an indirect material. Other – are there any – is there any documentary evidence from other manufacturers that would support Commerce's outcome? From other manufacturers? Well, a lot of the other – Mr. Tillop has written out a list of other – of documents that he thinks are supportive of the position that U.S. Magnesium takes with respect to other manufacturers. I'm just looking to you to see if there's anything on the other side of that ledger. Well, in some of the – in the other manufacturers, you know, with respect to Southern Magnesium, I mean, that's a company that's, you know, been out of business for several years. But initially, you know, until about 1996, I'm not positive of the exact year, there was some evidence that that meant that one particular manufacturer did treat retorts as a direct material. And then following that, the later financial statements don't show that retorts were treated as a direct material. What do you say to Mr. Tillop's argument on that point, that they're still folded into the – even though not specifically identified, they're still folded into the cost sheet in a way that indicates they're still being treated as direct materials? Well, that's an inference that U.S. Magnesium seeks to draw in its favor. Right. And what do you say that – what do you say that makes that inference unreasonable, if anything? It's not necessarily an unreasonable inference, but it's not necessarily one that commerce relied on when it made its determination. Commerce looked at that exact same financial statement and said it was inconclusive. Well, what – given the argument that he made this morning, what do you think is the flaw in his argument? You heard the argument he made in the brief. What's the aspect of his argument that you think would be a justification for commerce saying, well, that doesn't tell us much? Well, there are several. One is that there's really not one consistent practice. I mean, you look at a host of financial statements, some of them treat retorts one way, some of them treat retorts – they don't necessarily identify them as a direct material. And you can have also the same company that treated them as a direct material or identified them as a direct material for a certain period of years and then stopped identifying – or at least specifically identifying them as a direct material. So when you look at the facts that are actually known, the documentary evidence that's actually known, with respect to the replacement period and the lack of physical incorporation, given the inconclusive nature of some of the other material, I mean, it was reasonable for commerce to say, all right, these two ones tip the scales in the direction of identifying them as an indirect input. Again, reasonable minds can differ. You can look at two pieces of evidence in the same way and come out with different conclusions. But the conclusion that commerce drew from this case was not an unreasonable one. All right, well, again, the parties developed a very extensive record in this case. Commerce, as the agency charged by commerce as the master of the empty dumping laws, looked at the record evidence and made a factual determination that retorts should be treated as an indirect input in the factors of production. And having evaluated the steps taken by commerce, you know, it's past practice, and the evidence that I consider the trial court sustained commerce's determination, and respectfully this Court should affirm the judgment below. Thank you. You heard Judge Bryson's question earlier. If it pleases the Court, I'll try to do that. The Commerce Department in the issues and decision memorandum relied on two factors, which was the usage and the other. But it also considered several other. There are at least seven other factors that were considered if you look at the issues and decisions memorandum. One that was important that was argued by TMI was that these retorts were rented, and rental costs under GAAP in China are an indirect cost, not a direct cost. The Commerce Department considered that, but it did not feel it important enough to use as one of its rationales. They also considered the fact that in 1998, in this case, the Commerce Department found that retorts were overhead. So there was a historical look at that. They also looked at the treatment in the company's books and records, and found that in the company's books and records, in what were called costs, this is the cost subledger, the fact that they listed the retorts in there was not conclusive, because it also included various other things, including labor as a cost. That is not a direct material cost for certain. So it was not conclusive for that. They also considered that it was similar to vessels in aluminum and ironmaking, steelmaking industries. Furthermore, they looked at it as manufacturing equipment. TMI had argued that this was like manufacturing equipment. And finally, with regard to the cost of the retorts, they considered this, but did not consider it to be an important factor. So they did consider these things. So this court has to presume that there is administrative regularity by the administering authority here, and that they considered these, but that they did not find them to be key doesn't mean that it was an unreasonable decision. It was a reasonable decision. Could someone else have found another way? Yes, of course. But that's not the question. The question is whether they made a reasonable decision based on the record before them. And we argue that they did. So the decision is reasonable, and the court should allow the department to exercise its discretion in this case. I actually do still have a question that I promised I would reserve for you, which is how many cycles are there within the 60-day period? That is not part of the record. We don't know that from the record. What we know is that they were rented. And so we can get the number of days because they paid for the rental on that. And so the average number of days was about 60, but we don't know how many cycles that means. I mean, I can speculate, but it's not part of the record. But that's not in the e-commerce investigation and the information, which, when you say it's not part of the record, you're saying that it was not something that was investigated or that it just is not before us on this appeal. I think it was not questioned in that way. It has been five or six years, Your Honor, so I don't remember the facts exactly. But the question did not ask that. They asked what the usage period was. And because they rented them, that could be calculated. But how many cycles that meant, we can't glean that from the record, and I don't know it. There's nothing in the record that discloses, with respect to just the general pigeon process, roughly how long it takes for one cycle. I mean, there's obviously some discussion of the pigeon process in the abstract as opposed to in this particular case. The reason I'm asking, obviously, is if one cycle takes 60 days, then that makes the retorts look more like they are part of the raw material. Your Honor, I can say with certainty that one cycle is not 60 days. One cycle is more like one day. But you don't really have anything on the record to point to? No, there is nothing on the record. The department took the record that it had and made the best decision. Thank you. We went over a little on the other side to restore four minutes. Thank you. To answer your question, Judge Bryson, the record contains evidence of the consumption rate of retorts and the production of magnesium. CVM's offering memorandum refers to one retort per six megatons of production of magnesium. CMC identifies one retort per five metric tons of magnesium production. So retorts consumed with every one in five runs.  Whoa, whoa, whoa. That's the amount of magnesium that is produced before you've essentially exhausted the retorts capacity until it's refurbished. Right. But that doesn't tell us how many runs there are in that six megatons of magnesium. Right? I mean, I'm wondering how many times do they empty the tube, put it back, run the process, empty the tube, put it back, run the process, and so forth, until we get to the point that they need to replace the tube? Well, in the case of CMC where you have one retort consumed every five megatons and you're looking at 20%, you would run five production runs and you'd consume one retort. Are you saying that each production run is one megaton? No. Fair point. I understand your question. Yeah. I mean, I'm confused by your answer. Yeah. I don't know that every one metric ton, I doubt one metric ton is. I wouldn't think so. I'm looking at the pictures. I think it's more of a continuous process. All right. Next. Case-by-case analysis. There's been a lot in the government's brief and much discussion today about whether or not these decisions can be made on a case-by-case analysis. I understand that there's some latitude in administrative adjudication for the need for case-by-case determinations, but it's not unfettered discretion. You can't refer to case-by-case determinations in order to do away with the standard of review. And the standard of review here is whether there's substantial record evidence and whether there's evidence on the record that detracts from the finding. You can't get around that by saying simply this is a case that has to be decided on a case-by-case basis. But whether there's evidence that detracts from the finding? Absolutely. There almost always is. There is. But that doesn't defeat a finding of substantial evidence, right? No. The evidence has to be considered if it detracts from the final. Right. Here, evidence was not considered. The hack affidavit was not considered. Relative cost information, not considered. Traceability? You think it wasn't considered because it wasn't discussed? With respect to traceability, both the Commerce Department and the Court of International Trade said there is no record evidence regarding traceability. No record evidence is what they said. We looked at the evidence. Some is in favor. Some detracts. It said no record evidence. CMC, not discussed in the final or the remand determination. That's an important perspective that talks quite a bit about the manufacturing process for magnesium using the pigeon process. The material out specification sheet? Not in the final determination. Not in the remand determination. It's a critical accounting document. Not there. That evidence detracts from the final determination. It detracts from the decision and it wasn't considered. In our view, Your Honor, respectfully, that's reversible error. You have to consider that evidence. Counsel for the government referred to, you asked counsel for the government, what else is on the record that supports the determination other than physical incorporation and the 60-day period or average useful life of a retort? There isn't any other evidence. He struggled to answer that question because the other evidence doesn't support the decision and it is part of the problem that we have in this case, which is that the Commerce Department picked, of all those different factors and all the different tests, the test for indirect materials, the test for direct materials, the test for equipment, the test for process materials, they picked two things to focus on, and those are the two things where they found evidence that they believe supported their final determination. You can't go pick the criteria that you want just because those are the ones for which you can find evidence in the record that is supporting and say, we don't need to look at all these other factors. There's no evidence about traceability. There's no evidence about this. We're going to disregard that. We're not going to look at the hack affidavit. But it is the case, is it not, that physical incorporation has always been regarded as a very important factor? Agreed. It's not the most important factor. I would disagree with most. Until 2000, it was dispositive. Then Commerce decided in the silico-manganese decision that physical incorporation was no longer dispositive. It was still considered physical incorporation. Still dispositive, but an important thumb on the scale. Correct. I agree with that. However, out of the silico-manganese decision in 2000, there became a whole long line of cases called process materials cases. We've cited a lot of this jurisprudence in our brief. We could have cited more. In these cases, Commerce basically said even if the input is not physically incorporated into the final product, still it can be considered a direct material. You only have to look at silicon metal from Russia, and it's a perfect example. In that case, electrodes were used in the production process. Little tips of the electrodes would wear off through continuous use. The respondent in that case kept records of its use, and Commerce considered it to be a direct material. What was the period of life of the electrodes, tips? I don't know that there was a period of life. I think it was just a continuous sort of use of the electrode. One other thing I would like to point out, Roner, and this is from the government's brief when we're talking about process materials. Commerce described certain inputs as process materials and treated them as independent factors of production, that is direct materials. This is at page 20 of their brief. When, among other things, substantial quantities are consumed in the production process, and the cost of such materials constitute a significant portion of the cost of the final product. That's what the government said in this brief to this court about what is a process material. That's our case. Substantial quantities were used, consumed in the production process, and retorts comprised a significant portion of the cost of the final magnesium product. That's our case. It's a process material, and it should be considered that way by the court.  Time's up. Thank you very much, Your Honor. Thank you. We appreciate your attention to this case. I thank all parties in the case's submission. May it please the Court. This is an appeal from a decision of the Patent Trial and Appeal Board, rejecting as obvious all pending claims of the applicant's patent application directed to the treatment or prevention of the flu in humans by administering a particular compound known as Zanamivir by oral inhalation alone. So that's the inventive concept is strictly the administration of this drug orally? By oral inhalation alone, yes, Your Honor. This court should reverse the board's decision because there were two primary errors that were committed. The first is that the board failed to present a prime officiate case of obviousness because it based its obviousness determination on three factual findings that are not supported by substantial evidence. And second, even if the board had presented a prime officiate case of obviousness, the applicant submitted evidence of unexpected results that were sufficient to rebut the prime officiates showing. More specifically on that point, the board erred as a matter of law in requiring direct comparative evidence of unexpected results and in failing to give the evidence of secondary considerations due weight. So turning to the first error of failing to present a prime officiate case supported by substantial evidence, the three factual findings that are unsupported by substantial evidence are, first, that von Steen 2 teaches or suggests administering compounds for treating or preventing the flu by oral inhalation alone. The second factual finding error is that the compounds disclosed in von Steen 2 were enabling for teaching oral inhalation of Xanamivir. Firstly, von Steen 2 does refer to well-known delivery methods and it includes oral, right? Your Honor, von Steen 2 first specifically excludes Xanamivir from its compound and we respectfully submit that it does not teach or reasonably suggest oral inhalation. On three pages of von Steen 2 at pages A287 through A290 of the appendix, there is a first general introductory paragraph that describes what the modes of administration of the compounds disclosed in that reference are and that general paragraph lists a variety of modes of administration and among them is suitable oral administration modes. There are then corresponding paragraphs that follow that initial paragraph that specifically describe what each of those modes, how they can be administered. And for oral administration, it specifically does not say inhalation. The word inhalation is never used in the paragraph that describes the appropriate modes of oral inhalation. Instead, what it says is that oral administration can be capsules, caches, tablets, or oral liquid preparations that include dry products that are mixed with a liquid. Dry powders are also listed in that.